## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 16 2016, 8:48 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

John T. Wilson
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
James D. Boyer
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of: K.M., I.M., H.M., & G.M. (Minor Children): | June 16, 2016 |
| | Court of Appeals Case No. 48A04-1512-JC-2134 |
| C.K. (Mother), | |
| *Appellant-Respondent,* | Appeal from the Madison Circuit Court |
| v. | The Honorable G. George Pancol, Judge |
| | The Honorable Randall Hainlen, Senior Judge |
| Indiana Department of Child Services, | The Honorable Jack L. Brinkman, Juvenile Referee |
| *Appellee-Petitioner.* | Trial Court Cause Nos. 48C02-1503-JC-70, 48C02-1503-JC-71, 48C02-1503-JC-72, 48C02-1503-JC-73 |

**Bradford, Judge.**

# Case Summary

[1] T.M. ("Father") and C.K. ("Mother") are the parents of K.M., I.M., H.M., and G.M. (collectively, the "Children"). In March of 2015, the Indiana Department of Child Services ("DCS") received three separate reports that the Children were the victims of physical abuse and neglect by their parents. DCS also learned that the Children were the subject of child-welfare cases initiated in New York in 2014. After investigating the reports of abuse and neglect, DCS initiated legal proceedings in which DCS alleged that the Children were children in need of services ("CHINS").

[2] Father subsequently admitted that the Children were CHINS. Mother did not contest the facts relating to the allegations of abuse and neglect, but argued that the juvenile court could not properly exercise jurisdiction over her and the Children. The juvenile court determined otherwise and, following an evidentiary hearing, found the Children to be CHINS.

[3] On appeal, Mother does not challenge the sufficiency of the evidence to support the juvenile court's CHINS determination. Instead, Mother contends that the juvenile court erred by exercising jurisdiction over her and the Children. Concluding that the juvenile court properly exercised jurisdiction over Mother and the Children, we affirm.

# Facts and Procedural History

[4] The facts of this case are undisputed. Mother and Father[1] are the parents of the Children. The family moved frequently as a result of Father's employment as a truck driver. Prior to moving to Indiana in early 2015, the family had resided in New York.

[5] On March 6, 2015, DCS received a report that the Children were the victims of physical abuse and neglect. At some point, DCS also learned that the Children were the subjects of pending child-welfare cases initiated in New York in June of 2014. The New York child-welfare cases involved allegations of unsanitary home conditions, neglect, and domestic violence.

[6] DCS subsequently received two more reports that the Children were the victims of physical abuse and neglect. The reports indicated that

> the [C]hildren were unattended outside. Um that [I.M.] and [K.M.] were nude on the front porch on several occasions. Um that there was a school bus incident where the [C]hildren were running out towards the road. Um the allegations were that the bus driver had to honk to get the kids out of the road. Um there were allegations that um mom was locking the [C]hildren in their bedrooms, that the [C]hildren could be heard screaming and yelling from outside of the home, um and that there were allegations that one or more of the [C]hildren were feces

---

[1] Father does not appeal the trial court's order finding the Children to be CHINS.

smearing and Mom was not cleaning up the feces that was being smeared.

Tr. pp. 71-72. In responding to these reports, DCS completed an assessment during which DCS case assessor Virginia Jarnagin found the following:

[K.M.] c[a]me running from the downstairs bedroom. He [w]as completely nude, he was his hands and face were very dirty. Um I asked if I could see the other children. Um I went to the upstairs bedrooms. Um the first bedroom that I went into um there was a lock, a sliding lock on the outside of the door. I went in um and [I.M.] was laying in a toddler bed. He was completely nude, his hands, his face, um were completely covered with feces. There was feces in his bed, among his blankets, um an extensive amount of feces on the floor and smeared onto the wall. I then went into the adjoining bedroom. [H.M.] was in a crib. Um she was nude, um … also [her] hands, face, um were covered in feces. She was laying, I took the blanket off her, which was soaked in urine. It had both dry urine and soaked urine that … was laying on top of her. Um like I said she was nude. She was laying on top of a mattress that was plastic so the urine was actually … pooled on the mattress and she was laying in it. Her hair was completely saturated with urine. She had a sippy cup. Um there was urine, um there was feces all over the crib slats and all over the mattress. I then went downstairs, back downstairs, [G.M.] was in his car seat. Um that's where he was sleeping. Um his car seat or his …diaper was completely saturated um to where the diaper was jelling up and falling out. Um he smelled um strongly like urine, feces, spoiled milk. Um which was pretty overwhelming.

Tr. pp. 72-73. Jarnagin further indicated that the smell of the home "quite frankly [made her] want to throw up." Tr. p. 78.

Elwood Police Officer John Davis, Sr., who accompanied Jarnagin to the home, further stated that the Children were "dirty" and the family's home was "overwhelmingly smelly." Tr. p. 90.

> It was like human urine mixed with decaying. I mean the only way I can describe it, not to be too vulgar but the last time I smelled such strong odors it was death. It was very, very bad.
>
> ****
>
> We went threw [sic] all of the house and the kitchen was very[,] very bad. There was, I can only assume, several weeks' worth of trash built up on the floor. It was like climbing up the walls. Um there was decaying food everywhere. The sink was full [ ] of dirty dishes and the smell was really[,] really bad in there. It was obvious that it hadn't been maintained in quite some time…. [P]robably the most disturbing place was upstairs…. [Mother] would describe each room as to which kid slept here … it was overwhelming[], the smell was even worse, … I couldn't image it being worse then [sic] what I had already experienced but it was even worse. There was like piles of human poop on the floor. It had been there for a long time because they were hardened at this point. There was poop just smeared all over the walls. [Mother] described one small bed as her daughter's bed and the bed was plastic material. You know you're supposed to put a mat or a cover over it and everything but that plastic, you could see where a child had slept in it a long time cause it had kind of a form of a body there. And that … was, you know there was pee, standing pee in there…. There was one room where there was a big lock on the lock and [Mother] said well my husband locks our son in there because [ ] he is so uncontrollable and that room might have been the worst. There was more of the pee and poop and smeared everywhere.

Tr. pp. 90, 92-93.

[8] Following Jarnagin and Officer Davis's visit to the family's home, Mother was arrested for neglect and the Children were removed from the home. On March 13, 2015, DCS filed petitions alleging that the Children were CHINS. In these petitions, DCS alleged that the Children suffered physical abuse and neglect at the hands of their parents. DCS also alleged that parents had prior child welfare history in New York.

[9] On May 19, 2015, Mother filed a motion to dismiss the CHINS cases or, in the alternative, to transfer the cases to New York. Specifically, Mother argued that New York was the proper jurisdiction because Mother still had an open child welfare case in New York. The juvenile court took Mother's May 19, 2015 motion under consideration and gave DCS time to respond.

[10] The juvenile court conducted a hearing on May 27, 2015. During this hearing, Father admitted that the Children were CHINS and agreed to participate in services. Also during the hearing, Mother made an oral motion to transfer the cases to New York. In response to Mother's oral motion, DCS indicated that the New York cases were in the process of being transferred to Madison County. After considering the arguments of both parties, the juvenile court denied Mother's oral motion. The juvenile court subsequently conducted a hearing on Mother's May 19, 2015 motion to dismiss. Following this hearing, the juvenile court denied Mother's motion to dismiss.

[11] On October 2, 2015, the juvenile court conducted a fact-finding hearing as to Mother. At the beginning of the hearing, Mother renewed her motion to

dismiss, which the juvenile court denied. In response, DCS again reiterated that officials in New York had indicated to DCS that they were in the process of transferring the family's open New York cases to Indiana. At the conclusion of the hearing, the juvenile court adjudicated the Children to be CHINS. This appeal follows.

# Discussion and Decision

[12] Initially, we note that Mother does not challenge the sufficiency of the evidence to sustain the juvenile court's determination that the Children were CHINS. Instead, Mother argues that the juvenile court erred by asserting personal jurisdiction over her and the Children. Personal jurisdiction "refers to the right of the court to exercise jurisdiction over the particular parties who are brought before the court." *Truax v. State*, 856 N.E.2d 116, 122 (Ind. Ct. App. 2006). In arguing that the juvenile court erred by asserting personal jurisdiction over her and the Children, Mother claims that the Uniform Child Custody Jurisdiction Act (the "Act") applies, and that under the Act, New York was the proper jurisdiction for any custody issues concerning Mother and the Children. We disagree.

[13] Under the Act, an Indiana court has an affirmative duty to question its jurisdiction when it becomes aware of an interstate dimension in a child-custody dispute. *Barwick v. Ceruti*, 31 N.E.3d 1008, 1013 (Ind. Ct. App. 2015) (citing *Bowles v. Bowles*, 721 N.E.2d 1247, 1249 (Ind. Ct. App. 1999)). "When confronting an interstate custody dispute, the trial court must engage in a multi-

step analysis to determine: 1) whether it has subject-matter jurisdiction; 2) whether there is a custody proceeding pending in another state which would require the court to decline its jurisdiction; and 3) whether the trial court should exercise its jurisdiction because Indiana is the most convenient forum." *Id.* (citing *Bowles*, 721 N.E.2d at 1249). Although a CHINS case is not a custody dispute per se, we have held that when considering a CHINS case, a juvenile court must exercise its jurisdiction within the framework and policy considerations of the Act. *See Matter of E.H.*, 612 N.E.2d 174, 182 (Ind. Ct. App. 1993) (providing that "a CHINS court can and must" exercise its jurisdiction within the framework and policy considerations of the Act).

[14] We review a juvenile court's determination regarding jurisdiction for an abuse of discretion. *Barwick*, 31 N.E.2d at 1013. "An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court." *Id.* "The court also abuses its discretion when it misinterprets or misapplies the law." *Id.* The Act provides that an Indiana court has jurisdiction if Indiana is the home state of the children at issue when the proceedings were commenced or if the home state declines to exercise jurisdiction. *Id.* (citing Ind. Code § 31-21-5-1).

[15] Mother argues that the case should have been transferred to New York because New York did not decline to exercise jurisdiction over the instant matter. However, Mother fails to establish that such an act was necessary before the juvenile court could exercise jurisdiction over the instant matter. The record indicates that DCS became involved with Mother and the Children after

receiving numerous reports of neglect and abuse. The reported neglect and abuse was alleged to have occurred in Madison County. Further, although Mother and the Children had previously lived in and were the subject of prior child-welfare proceedings in New York, at the time DCS became involved with Mother and the Children, the family was living in Madison County. The record also reveals that during the May 27, 2015 hearing, DCS informed the juvenile court that since the family had moved to Indiana, the New York court was in the process of relinquishing jurisdiction by transferring its prior child-welfare cases involving Mother and the Children to Indiana.[2] These facts demonstrate that as of the date of the initiation of the underlying CHINS proceedings, the family was residing in Indiana, Indiana had an interest in protecting the Children as they were living within its borders, and Indiana was the most convenient forum to address the concerns relating to the neglect and abuse of the Children. As such, we conclude that the juvenile court properly exercised jurisdiction over the underlying CHINS proceedings.

[16] Further, we observe that in arguing that jurisdiction belonged in New York, Mother claimed that she intended to move back to New York at some point. Mother, however, did not present any evidence relating to any concrete plans to move back to New York or to a time frame in which she intended to make this potential move. The juvenile court was not required to credit Mother's

---

[2] This fact clearly distinguishes the instant case from *In re the Matter of E.H.*, in which the Texas court indicated that while Indiana had jurisdiction over certain custody issues, it was retaining jurisdiction over the issues of visitation, child support, and attorney's fees. 612 N.E.2d at 179.

unsupported claim regarding her possible future intentions. *See generally McCullough v. State*, 985 N.E.2d 1135, 1139 (Ind. Ct. App. 2013) (providing that the jury, acting as the trier of fact, was under no obligation to credit defendant's statement to police as evidence that he acted without fault or that his actions were reasonable).

# Conclusion

[17] Again, on appeal, Mother only challenges the juvenile court's exercise of jurisdiction. Because we conclude that the juvenile court properly exercised jurisdiction over the underlying CHINS proceedings, we affirm the judgment of the juvenile court.

[18] The judgment of the juvenile court is affirmed.

Bailey, J., and Altice, J., concur.